Jay Lee GATES; John Ronald Bertram, Plaintiffs–Appellees,

v.

James GOMEZ;* Nadim Khoury, M.D., Assistant Deputy Director—CDC Health Services; Kenneth Shepard, Chief Deputy Warden for CMF Clinical; Nicholas Poulos, M.D.; Thor Daniel, Chief Physician and Surgeon, CMF; Paul Morentz, Chief Psychiatrist—CMF Outpatient Program, H MD; Bruce Baker, A R MD, Chief Psychiatrist Northern Reception Center; D. Michael O'Connor; Douglas G. Arnold, Acting Director of the California Department of Mental Health; Clyde Murrey, Acting Deputy Director for State Hospitals; Sylvia RN, Executive Director DMH Vacaville Psychiatric Program; Eddie Yslt, Defendants–Appellants,

and

George Deukmejian, Defendant.

Jay Lee GATES, Plaintiff–Appellee,

v.

James GOMEZ,* et al., Defendants–Appellants,

and

George Deukmejian, Governor, Defendant.

Nos. 94–15259, 94–15884.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1995.

Decided June 9, 1995.

As Amended Aug. 3, 1995.

---

* James Gomez is substituted for his predecessor, James Rowland, as Director of the California Department of Corrections. Fed.R.App. P. 43(c)(1).

James E. Flynn, Deputy Atty. Gen., Sacramento, CA, and Allen R. Crown, Deputy Atty. Gen., San Francisco, CA, for defendants-appellants.

Sanford Jay Rosen and Michael W. Bien, Rosen, Bien & Asaro, San Francisco, CA, for plaintiffs-appellees.

Before: GIBSON,** GOODWIN, and HUG, Circuit Judges.

HUG, Circuit Judge:

This case originated as a civil rights class action under 42 U.S.C. § 1983 and 29 U.S.C. § 794 challenging medical care, psychiatric care, and conditions of confinement at the California Medical Facility and Main Northern Reception Center ("CMF") in Vacaville, California.[1] The suit also challenged the care and confinement of a subclass of HIV-infected inmates. The case went to trial in September, 1989. After plaintiffs rested their case, settlement negotiations culminated in a consent decree which was approved March 8, 1990. The operation of the consent decree has thus far given rise to two published appellate opinions: *Gates v. Rowland*, 39 F.3d 1439 (9th Cir.1994), and *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir.1993). This opinion is the third.

** Honorable Floyd R. Gibson, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

1. CMF is California Department of Correction's primary health care facility for the medical and psychiatric treatment of inmates with serious acute or chronic illness.

This opinion consolidates two appeals from enforcement orders under the consent decree. One appeal, No. 94–15884, is from an injunction modifying defendants' policy on the use of 37mm riot-control guns to control mentally ill inmates locked in their cells. The other appeal, No. 94–15259, is from a district court order awarding plaintiffs disputed attorneys' fees for compliance and monitoring work under the consent decree during 1991. We have jurisdiction to hear these two appeals pursuant to 28 U.S.C. § 1291, and as to both, we affirm in part and reverse in part.

## I.

### No. 94–15884: 37mm GUN

In this appeal, defendants challenge a district court order modifying their use of the 37mm gun to control mentally ill inmates locked in their cells. The district court ordered this modification pursuant to § V.F.1 of the Consent Decree. Defendants argue that the consent decree does not cover their use of the 37mm gun. They also argue that even if the decree does cover such use, the district court erred by not applying an Eighth Amendment standard to judge compliance with the decree. Finally, defendants argue that the district court abused its discretion by ordering the modifications because the district court order was not supported by the record and defendants were, in fact, in compliance with the decree.

We affirm the district court order in all respects except one. We hold that the district court abused its discretion by ordering the modification of defendants' 37mm gun policies to preclude the gun's use to protect property. Such a modification was not adequately supported by the record.

### A. Facts

Beginning in March 1992, two years after the decree was approved, defendants began using a 37mm grenade launcher shooting multiple rubber baton rounds (hereinafter "37mm gun") to control mentally ill inmates.

Each discharge of the 37mm gun shoots four hard rubber projectiles against mentally ill patients in closed cells. The gun makes a sound like a firecracker or cherry bomb when fired. The practice at issue in this appeal is defendants' use of the gun to extract violent or agitated mentally ill inmates from their cells. Before the gun is fired, the inmate is warned that the gun will be used. If he remains uncooperative, a warning shot is fired away from the inmate. If the inmate is still uncooperative, a second shot is ricocheted in his direction.

Plaintiffs objected to this practice on the ground that it violates § V.F.1 of the Consent Decree. They contend that use of the 37mm gun on mentally ill inmates poses unreasonable risks of serious psychological harm and physical trauma, that defendants use the gun to extract mentally ill prisoners from their cells when there is no important reason to remove them, that defendants fail to exhaust non-physical alternatives before using the gun, and that they fail to meaningfully consult with clinical staff before using the gun. Instead of the 37mm gun, plaintiffs advocate use of Management of Aggressive Behavior ("MAB") techniques,[2] which are used by all other psychiatric prison facilities in the country to manage aggressive behavior and are approved by the American Psychiatric Association. In contrast, only defendants use the 37mm gun to control mentally ill inmates, and such use has not been approved by the American Psychiatric Association, the American Medical Association, or any correctional standard setting body.

The parties engaged in informal mediation of this issue. After two evidentiary hearings, no agreement was reached and the mediator entered his findings and recommendations on June 18, 1993. Both parties filed objections. The magistrate judge adopted the mediator's findings and a modified version of his recommendations on February 23, 1994. Defendants filed objections to the magistrate judge's findings and recommendations. The district court ruled on March 22, 1994, adopting the magistrate judge's findings and rec-

---

2. Under MAB techniques, a number of staff, usually 4–6, use personal physical restraint to sub- due the patient.

ommendations, and entered its order on July 20, 1994. The district court denied defendants' request for a stay pending appeal of this order.

### Defendants' Policy

After plaintiffs objected to the gun's use but before the evidentiary hearings, defendants implemented written policies on their use of the 37mm gun, which are set out in the California Department of Corrections Operations Manual at 55050.30 (March 19, 1993). Under these policies, the final decision to utilize the 37mm gun is made by custody personnel, although the inmate's file is reviewed by clinical staff.

Specifically, only the warden or chief deputy warden, or during nonbusiness hours the administrative officer-of-the-day, can authorize the gun's use. In a life-threatening or extensive property-threatening emergency, when time does not permit prior approval, the watch commander may authorize the gun's use. The gun can only be used: (1) in self-defense or defense of others; (2) to prevent escape or serious injury to persons or damage of a substantial amount of property; (3) to contain a violent situation or prevent serious injury threatened by a group of inmates; (4) to prevent suicide or self-inflicted injury by an inmate barricaded within a cell or other enclosed area; or (5) to accomplish a necessary change in location after the inmate has been given reasonable opportunity to cooperate in the relocation process. In this last situation, the inmate must be given notice that the gun will be used if he does not cooperate, and lesser alternatives must be explored. A medical technical assistant must be present during the gun's use. The gun cannot be fired directly at the inmate; it must be ricocheted in the direction of the inmate. And if the inmate has a psychiatric classification, then either a psychiatrist, psychologist, licensed clinical social worker, or psychiatric nurse must review the inmate's file to identify any contraindications to the use of the gun. But the policy does not prevent the warden from ordering the gun's use over a clinician's objection.

### District Court Order

The district court ordered the following revisions to defendants' policy on the use of the 37mm gun:

A. The 37mm gun will be used on inmates in psychiatric classification in cells or other confined areas only as a last resort after custodial and clinical staff have determined that the situation cannot be controlled by non-physical intervention or lower levels of force.

B. The Warden or the Administrative Officer acting in the Warden's place will certify in writing that the 37mm gun may be used on a specific inmate to:

1. prevent or stop serious assaultive behavior;

2. prevent an ongoing escape;

3. prevent suicide or imminent serious self-inflicted injury; or

4. accomplish a necessary change in location required for serious medical or health reasons after the inmate has been given a reasonable opportunity to cooperate and has refused.

C. A psychiatrist will review the medical file of the patient on whom use of the 37mm gun is being considered and personally evaluate the inmate to determine whether there are any medical or psychiatric reasons why the gun should not be used. The psychiatrist will approve or disapprove use of the 37mm gun in writing for the record.

D. If the psychiatrist approves the use of the 37mm gun, he or she will remain and observe the use of the gun on the inmate through completion of the cell extraction.

E. If the psychiatrist does not approve the use of the 37mm gun on the inmate, the Warden or Administrative Officer acting in the Warden's place will order alternative methods of restraint approved by CDC policy.

F. In emergency cases constituting actual life threatening situations wherein time does not permit prior approval, the Watch Commander may authorize the use of the 37mm gun. However, immediately following the emergency situation, notifica-

tion of such use will be made to the Warden and the Psychiatric Officer of the day who will be responsible to review the appropriateness of such action and document their findings for the record.

## B. *Standard of Review*

■ Pursuant to § IX.6 of the Consent Decree, if a party objects, the district court reviews the mediator's report *de novo*. It also reviews *de novo* the magistrate judge's findings of fact to which a party has objected. 28 U.S.C. § 636(b)(1). It reviews the magistrate judge's conclusions of law *de novo*, as well. *Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir.1983).

■ We review *de novo* the district court's interpretation of the consent decree. *Officers for Justice v. Civil Serv. Comm'n*, 934 F.2d 1092, 1094 (9th Cir.1991). "However, we give deference to the district court's interpretation based on the court's extensive oversight of the decree from the commencement of the litigation to the current appeal." *Id.; accord Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 893 (9th Cir.1982). Deference is appropriate in this case, as it has been under the supervision of District Judge Karlton and Magistrate Judge Moulds since its inception. We review for clear error the district court's findings of fact. *United States v. Gila Valley Irrigation Dist.*, 31 F.3d 1428, 1432 (9th Cir.1994). The district court order requiring defendants to modify their policies is effectively an injunction and will be reversed "only where the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *Id.* at 1442 (interpreting a consent decree enforcement order as a preliminary injunction and applying the above standard of review).

## C. *Scope of the Consent Decree*

Defendants claim that the district court had no jurisdiction to issue an enforcement order regarding their use of the 37mm gun because the gun's use was not covered by the consent decree. The district court order is based on § V.F.1 of the Consent Decree, which states, "Defendants will provide appropriate psychiatric screening for each incoming inmate at CMF and will provide appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated." Defendants maintain that shooting a mentally ill prisoner in his cell with rubber bullets is not "psychiatric treatment," and thus not regulable under the decree. Plaintiffs maintain that shooting a mentally ill prisoner in his cell with rubber bullets can have an adverse effect on "appropriate psychiatric treatment," and thus, falls within the requirements of section F.1. We agree with the district court and conclude that defendants' use of the 37mm gun is covered by the consent decree.

■ A consent decree is construed with reference to ordinary contract principles of the state in which the decree is signed. *Gates v. Rowland*, 39 F.3d at 1444. In California, contracts are interpreted using an objective test to give effect to the mutual intention of the parties as it existed at the time the contract was made. *Id.* "The language of the contract governs if it is clear and explicit. Words in a contract are generally understood in their ordinary and popular sense, and technical words are interpreted as usually understood by persons in the profession or business to which they relate." *Id.* (citations omitted). Pursuant to § IX.6 of the Consent Decree, "[t]he burden of persuasion is on the party who has objected to the Mediator's findings and recommendations." In this case, the burden of persuasion is on defendants.

■ The defendants maintain that the type of restraint to be used is purely custodial and thus not covered by the decree. The district court, following the mediator's recommendations, held that while generally the decision to use force on mentally ill prisoners and the type of force to be used is a custodial decision, the type of force *not* to be used is a clinical decision. It framed the issue thus: "The issue is not whether the use of the weapon is a 'treatment' within the meaning of the Decree. The issue is whether prison officials may make and implement custody decisions which are medically contraindicated. Breach of such a duty is clearly encompassed by the Consent Decree." And as the

mediator pointed out, "If the use of a 37mm gun in a given case is contraindicated medically, and the weapon is still used, the patient would not be receiving appropriate psychiatric treatment as required by the Consent Decree." The mediator found that the use of force to control a mentally ill inmate

> is not treatment which is "medically indicated" in the sense that term is commonly used and understood in mental health circles. The decision to use force is not part of the inmate's treatment plan. The question is more properly phrased as to whether the particular force used to restrain or remove a patient is contraindicated. That is, has a physician made a professional judgment that the means to be used poses a substantial risk of harm to the patient's medical or mental health which outweighs the need for control and the possible risk of harm to staff and the patient from the use of other means?

We agree with the mediator, the magistrate judge, and the district court that § V.F.1 of the Consent Decree encompasses defendants' use of the 37mm gun.

The decree has a specific section imposing a restriction on the use of taser guns.[3] The defendants contend that the specific regulation of the use of taser guns in § V.D of the Consent Decree precludes the district court's interpretation of § V.F.1 of the Consent Decree to include a general medical limitation on the use of weapons to restrain mentally ill inmates. The two provisions are not inconsistent. Section V.D, covering tasers, is a specific application of the general standard set forth in section V.F.1; the district court's order is another specific application of section V.F.1 covering 37mm guns, which were not in use when the decree was entered. There is no reason the taser policy need be identical to the 37mm gun policy; they are different weapons with different risks. The

district court's application of these sections is a reasonable interpretation of the decree.

### D. Standard for Compliance

■ Defendants argue that even if the consent decree covers the use of the 37mm gun, the district court applied the wrong standard in judging compliance. Without citing any law, defendants argue that compliance is to be judged under the "deliberate indifference" standard of the Eighth Amendment. We rejected this argument in Gates v. Rowland, and we reject it again here.

Section I.21 of the Consent Decree states, "The parties agree that in entering into this Consent Decree they waive specific findings of fact and conclusions of law and any determination whether the remedies provided are legally required." And section I.25 states, "The parties agree that it is not the intent of this Consent Decree to prescribe the minimum standards required by the United States Constitution." On the basis of these provisions, we concluded in Gates v. Rowland, "Where the parties negotiated use of a constitutional standard, they specified so in the language of the consent decree. Otherwise, the consent decree is not limited to constitutional standards." 39 F.3d at 1444.

Section V.F.1 of the Consent Decree provides the governing standard in this case, that of appropriate psychiatric treatment as medically indicated. This is a sufficiently specific standard with which to judge defendants' compliance.

### E. Enforcement Order

Defendants' last argument is that even if the consent decree covers use of the 37mm gun, and even if the district court applied the correct standard in evaluating defendants' compliance with the consent decree, the district court abused its discretion in ordering reform of defendants' 37mm gun policies.

---

**3.** Section V.D of the decree covers "Tasers, Restraints and Involuntary Medications." Sections 1–3 cover the use of the taser, and section 4 covers administration of involuntary medication. Under this section, tasers cannot be used to restrain a prisoner to administer involuntary medication, and the use of tasers on prisoners with psychiatric classifications or taking antipsychotic medications must be limited to the great-

est extent possible. Specifically, custodial staff must confer with a psychiatrist before using a taser and such a conference must be documented except in emergencies; alternative means must be considered and the reasons for their rejection stated in writing before a taser can be used; and periodically, incident reports on the use of tasers on prisoners with psychiatric classifications must be provided to the mediator.

Defendants argue that the district court made no specific finding that defendants had violated the decree; therefore, the court had no authority to modify defendants' policies. Defendants also argue that, irrespective of whether a finding was made, defendants' policies do not actually violate the consent decree; therefore, the district court abused its discretion in modifying defendants' policies. Finally, defendants argue that the district court abused its discretion by modifying the mediator's recommendation and prohibiting use of the gun to prevent property damage because this modification was not supported by the record.

■■■ First, a specific finding of a past violation of a consent decree is not prerequisite to an injunction preventing a future violation. *See, e.g., Vertex,* 689 F.2d at 892 ("the district court could properly clarify that ambiguous language [of the consent decree], and this it did, requiring defendants to change their future advertising to comply with the consent judgment, as clarified."). Moreover, in adopting the mediator's report, the district court did find that defendants' policies violate the consent decree. The mediator found, "The final decision to utilize the 37mm gun [at CMF] is made by custody personnel." This was in contrast to its finding that "[t]he type of restraint procedures used with mentally ill patients should normally be a clinical decision. If an emergency arises which requires custody officials to make the decision regarding restraint procedures with mentally ill patients, such a decision should not be medically contraindicated." The mediator similarly found, "since CMF is a prison health care facility, no custody decision should be made that is medically contraindicated." The mediator specified that this decision should be made by the professional judgment of a physician. The mediator found that "CMF policy allows a social worker or psychiatric nurse to make the determination whether the use of a 37mm gun is medically contraindicated." Thus, the district court, in adopting the findings of the mediator, did find that defendants violated the consent decree.

Defendants also argue that the district court's interpretation of the decree to require

a psychiatrist's approval before the gun is used was not supported by the record because the evidence did not conclusively establish that the gun is more dangerous than MAB techniques. The mediator found,

> 6. Medical experts testified that the use of the 37mm gun on mentally ill patients could be traumatizing and result in psychological injury to the patient, but there were no studies presented to support this opinion.

> 7. No evidence based on studies was presented which demonstrated that the use of a 37mm gun in cell extractions reduced or increased the risk of injury to staff or to patients.

The mediator further explained,

> There was extensive testimony of experts as to whether the use of a 37mm gun produced any long term effect on the course of a patient's mental illness or his relationship with the treating staff. This testimony was totally based on opinion with no studies or tangible evidence to support the diametrically opposed positions.... At best, [ ] one can only declare a draw—with plaintiffs' experts testifying that the use of any weapon may have a traumatic and lasting impact on a patient, and defendants' experts testifying that there was no evidence of such damage in the cases at CMF.

> There was also disagreement amongst the experts as to whether more "force" is used with a 37mm gun or when a MAB approach is used.... It should be noted, however, that when the 37mm gun is used at CMF it is still often necessary for staff to enter the cell and physically restrain the inmate.

■■■ But the district court did not abuse its discretion in requiring the modification of defendants' policies because its order accommodated the mediator's findings. The court did not entirely ban the gun's use. Instead, the district court took a case-by-case approach, shifting the decision of whether to use the gun to a physician. The district court adopted the mediator's conclusion that,

> The decision to control, and the method of control, properly belongs to custody offi-

cials. However, since CMF is a prison health care facility, no custody decision should be made that is medically contraindicated. If the use of a 37mm gun in a given case is contraindicated medically, and the weapon is still used, the patient would not be receiving appropriate psychiatric treatment as required by the Consent Decree.

To allow the use of a 37mm gun with mentally ill patients, then, there must first be an approval that such a use of force is not medically contraindicated.

In this way, the district court comported with the requirements of the consent decree—that use of the gun be medically appropriate. Instead of imposing its own judgment, the district court relied on the judgment of defendants' own physicians that the gun's use on a particular prisoner would not be medically contraindicated.

■ But the district court order veered from this sound position when it limited the purposes for which the 37mm gun can be used by defendants. The mediator's recommendations allowed defendants to use the gun to "prevent imminent substantial property damage." But the magistrate judge and district court rejected this recommendation and did not include the prevention of imminent substantial property damage as one of the allowable uses of the gun.

The touchstone of section V.F.1 as applied to this case is whether the restraint at issue is medically contraindicated. Where it has been found that an individual use of the gun is not medically contraindicated, there is no basis in section V.F.1 for a court order prohibiting the gun's use for that particular purpose. We hold that the district court abused its discretion by prohibiting the gun from being used to prevent "imminent substantial property damages" when there is no medical contraindication for the use of the gun.

### CONCLUSION

Defendants' use of the 37mm gun falls under § V.F.1 of the Consent Decree. The standard for measuring compliance with this section is whether the defendants' use of the 37mm gun corresponds with providing appropriate psychiatric treatment. With one exception, the district court did not abuse its discretion by requiring the defendants to modify their policies concerning the use of the 37mm gun. This one exception is the district court's failure to include the prevention of imminent substantial property damage as a permissible use of the gun. We affirm in part and reverse in part the order of the district court.

### II.

### *No. 94–15259: ATTORNEYS' FEES*

The district court awarded plaintiffs a portion of their disputed attorneys' fees for 1991 compliance and monitoring work under the consent decree. Defendants appeal this order, contending that the district court abused its discretion in making this award because plaintiffs' billing statements were not sufficiently detailed, and some of the hours paid represent work in which plaintiffs did not prevail, work that was not reasonably related to compliance and monitoring of the consent decree, or inefficient work. We affirm the district court order in part and reverse in part.

### A. *Facts*

Section XI.1 of the Consent Decree sets forth the parties' agreement as to attorneys' fees. It states,

> Plaintiffs may seek to recover reasonable costs and attorneys' fees and other expenses that may be sought pursuant to 42 U.S.C. section 1988 and 29 U.S.C. section 794(b) for work performed in this matter prior to entry of this Consent Decree and reasonably performed during the pendency of this Consent Decree. Reasonable costs and expenses shall be awarded in amounts agreed to by the parties or, absent agreement, as determined by the Court upon plaintiffs' noticed motions.

Pursuant to procedures established by the district court and agreed to by the parties, plaintiffs submit to defendants quarterly statements of their attorneys' fees and costs. If defendants dispute the amount of the request, plaintiffs may file with the district

court a periodic motion to compel payment. The resolution of the parties' first fee dispute is published in *Gates v. Deukmejian*, 987 F.2d at 1396. The resolution of a second fee dispute is published in *Gates v. Rowland*, 39 F.3d at 1448. *Gates v. Deukmejian* involved fees incurred prior to entry of the consent decree, while *Gates v. Rowland*, like the present appeal, involved post-judgment monitoring fees.

This appeal concerns the disputed portion of plaintiffs' 1991 fees requests. Defendants paid parts of the 1991 requests without contest. During negotiations, plaintiffs reduced the disputed portion of their bill by $8,743.75; during the motion to compel disputed fees, plaintiffs reduced their bill by an additional $5,148. The magistrate judge issued his findings and recommendations on the disputed 1991 fees on September 15, 1993, further reducing plaintiffs' fees by $18,533.18. On January 4, 1994, the district court adopted the magistrate judge's findings and recommendations with one clerical correction, awarding plaintiffs $203,908.65 in attorneys' fees and costs.

## B. *Standard of Review*

We review for abuse of discretion a district court's award of attorneys' fees and costs under section 1988. *Gates v. Rowland*, 39 F.3d at 1448. Legal conclusions involved in the determination are reviewed *de novo*. *Holland v. Roeser*, 37 F.3d 501, 503 (9th Cir.1994). "The district court has a great deal of discretion in determining the reasonableness of the fee and, as a general rule, we defer to its determination." *Gates v. Deukmejian*, 987 F.2d at 1398; *see also Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."). But the district court must nonetheless articulate its reasons for the fee award. *Id.*

## C. *Discussion*

Defendants offer four challenges to the district court's award of attorneys' fees. First, they claim that the district court erred because it did not reduce plaintiffs' fees based on the outcome of their work. They urge us to apply a prevailing party standard under 42 U.S.C. § 1988 to post-judgment monitoring and compliance work under the consent decree. But plaintiffs have already met the section 1988 prevailing party standard with the entry of the consent decree. *See Keith v. Volpe*, 833 F.2d 850, 857 (9th Cir.1987) (holding that post-judgment monitoring of the consent decree was a necessary aspect of plaintiffs' prevailing in the case, thus plaintiffs satisfied the § 1988 prevailing party requirement). We already decided, in *Gates v. Rowland*, 39 F.3d at 1450, that the standard to be applied to disputed billing items for compliance and monitoring work under this consent decree is "whether the services were reasonably performed during the pendency of the consent decree." As the magistrate judge noted, under this standard, outcome is relevant to whether the work performed was reasonable, but it is not the touchstone for a fee award. This "reasonable performance" standard was set out in the consent decree and confirmed by the district court in its Order Establishing Procedure for Collecting Attorneys' Fees and Costs During the Pendency of the Consent Decree, which order defendants did not appeal.

Defendants further claim that the district court abused its discretion in awarding plaintiffs fees because plaintiffs' billing statement 1) was not sufficiently detailed, 2) represented duplicative and inefficient work, and 3) represented work not reasonably related to compliance and monitoring of the consent decree. As we stated in *Gates v. Deukmejian*, and again in *Gates v. Rowland*:

> The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of

the hours charged or the facts asserted by the prevailing party in its submitted affidavits.

*Gates v. Rowland,* 39 F.3d at 1449 (quoting *Gates v. Deukmejian,* 987 F.2d at 1397–98).

■ Defendants contend that plaintiffs' statement was not sufficiently detailed because it did not identify the subject matter and party to "hundreds of hours of 'client communications.' " As the Supreme Court held, "The applicant should . . . maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. Plaintiffs' billings for client communication included the date of the communication, the person who performed it, and in some cases the issue addressed. As plaintiffs explained before the district court and on appeal, they did not reveal the names of inmates with whom they communicated to protect the confidentiality of their communications and because their clients fear retaliation, and they did not always reveal the issue discussed to preserve attorney-client and attorney work product privileges. The magistrate judge found the detail of plaintiffs' billing statements "more than sufficient," and the district court adopted this finding. The magistrate judge found, "It is axiomatic that counsel's monitoring activities will include communication with members of the class," and even though the issue discussed in the communication was not always provided, "the cumulative effect of the records" allowed him to conclude that time spent communicating with clients was reasonable. The district court did not abuse its discretion in adopting this finding. *Cf. Davis v. City and County of San Francisco,* 976 F.2d 1536, 1542 (9th Cir. 1992) (warning against imposing too high a standard of documentation on fee claimants), *vacated in part,* 984 F.2d 345 (9th Cir.1993).

As to the third claim—that plaintiffs' hours were duplicative and inefficient—defendants did not meet their rebuttal burden of submitting evidence challenging the accuracy and reasonableness of the hours charged or the facts asserted. The magistrate judge pointed out,

Defendants filed a separate appendix of annotated billing statements reflecting their disagreements with the joint annotations. Defendants' appendix has provided remarkably little assistance to the court in the resolution of these issues: These annotations do not indicate, in some cases, the amount of time objected to or, in other instances, the ground on which defendants object; the document is approximately 300 pages long and is not paginated; defendants do not provide a key or index to the coded objections to the billings; defendants themselves do not rely on the appendix or reference it in support of their objections to plaintiffs' billings; and the annotations reflect only a portion of defendants' objections to plaintiffs' billings, thereby requiring the court to engage in time-consuming comparison of the parties' appendices.

On appeal, we are restricted to the evidence produced in the district court.

■ Finally, defendants claim that the district court erred in awarding plaintiffs fees for work not reasonably related to compliance and monitoring of the consent decree. Plaintiffs' counsel were awarded fees for filing an amicus brief to the district court in *Camarillo v. McCarthy,* 998 F.2d 638 (9th Cir.1993), which challenged medical and living conditions for AIDS and HIV-infected inmates at CMF. They filed the brief to protect the interests of the class, since both the class and some of the issues raised in *Camarillo* were identical to the subclass and issues raised in the present action. The district court did not abuse its discretion in finding that plaintiffs' work on the *Camarillo* amicus brief was reasonably related to compliance and monitoring work under the consent decree.

■ But the district court did abuse its discretion in awarding plaintiffs attorneys' fees for attending the Forensic Mental Health Association Annual Conference and for media contact. These are the kinds of activities that attorneys generally do at their own expense.

### CONCLUSION

Defendants did not meet their rebuttal burden of providing specific evidence that

plaintiffs' hours were duplicative or inefficient. Plaintiffs' billing statements were sufficiently detailed and the hours compensated for work on the Camarillo amicus brief were reasonably related to compliance and monitoring work under the consent decree. In these respects, we affirm the district court's award of attorneys' fees. But we reverse the district court's award of attorneys' fees for attendance at the Forensic Mental Health Association Annual Conference and for media contact.

**AFFIRMED in part, REVERSED in part, and REMANDED for recalculation of the attorneys' fees.**